IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SHIRLENE CAMPBELL,                )
                                  )
        Plaintiff,                )
                                  )        NO. 3-05-0194
v.                                )        JUDGE HAYNES
                                  )
SUMNER REGIONAL HEALTH            )
SYSTEMS, INC. AND SUMNER          )
REGIONAL MEDICAL CENTER,          )
                                  )
        Defendants.               )

## MEMORANDUM

Plaintiff, Shirlene Campbell, filed this action under Title VII of the Civil rights of 1964, as amended, 42 U.S.C. § 2000e et seq. against the Defendants: Sumner Regional Health Systems, Inc. ("SRHSI") and Sumner Regional Medical Center ("SRMC"), her former employer. Plaintiff, an African-American, asserts claim of racial discrimination arising out of her work as manager of the hospice section at SRMC that ultimately led to her termination. The Defendants filed an answer denying Plaintiff's allegation and the parties proceeded with discovery.

Before the Court is the Defendants' motion for summary judgment (Docket Entry No. 35), contending, in sum, that the undisputed facts establish that the Defendants hired Plaintiff for a managerial position at SRMC, but due to Plaintiff's persistent performance problems and after affording her opportunities to correct the cited job deficiencies, the Defendant terminated her. The Defendants contend that Plaintiff lacks proof of any comparable employee who was treated more favorably than Plaintiff.

Plaintiff responds that she was not given sufficient institutional support and that she received some favorable ratings for her job performance during her tenure at SRMC.(Docket Entry No. 36).

Plaintiff also relies upon inferences from SRMC's employment record and SRMC's vice president's lack of knowledge about Plaintiff's termination, to contend that her termination was motivated by her race.

## A. Findings of Fact[1]

SRMC is an affiliate of Sumner Regional Health Systems, Inc.("SRHSI") , a non-profit health system that operates a hospital in Sumner County, Tennessee. (Docket Entry No. 46, Plaintiff's Responses to the Defendants' Statement of Undisputed Facts at ¶ 1). For the time at issue, SRMC's home care services department included a home health services section and a hospice services section. Id. at ¶ 4. Home health services provides nursing, social work, and other services to home-bound patients for usually 40 to 60 patients that is larger than the hospice section's patient population. Id at ¶ 5.

The hospice section provides nursing, social work and bereavement services to a population of terminally ill patients who have chosen to spend their final period of their illness at home. Id. at ¶ 6. The total number of patients ranged from two to twenty patients. Id. Plaintiff asserts that during her tenure at SRMC, on average, hospice had a census of eight to ten patients. Id. Hospice's patients are referred by physicians. Id. at ¶ 8.

The hospice manager is responsible for directing the clinical and administrative functions of the hospice section. Id. at ¶ 9. During the relevant period, the hospice manager reported to Paulette Fewell and later Paula Farrell, the director of home health services. Id. at ¶10. Farrell's

---

[1] Based upon the Plaintiff's responses to the Defendants' Statement of Undisputed Facts (Docket Entry No. 46) and the Plaintiff's submissions as well as the applicable law, the Court concludes that there are not any material factual disputes and this section constitutes findings of fact under Fed, R. Civ. P. 56(e).

direct supervisor was Nicole Brashear, the vice president of ancillary services. Id. at ¶ 12. Brashear reported to David Vance Executive Vice President. Id. at ¶ 13.

Plaintiff who has a degree in social work, learned of SRMC's hospice manager position at a job fair and applied. Id. at ¶ 15. Paulette Fewell initially interviewed Plaintiff and later Fewell, Paula Farrell, and Nicole Brashear interviewed Plaintiff. Id. at ¶ 15. Brashear and Farrell recommended that Campbell be hired for the position. Id. at ¶ 16. Farrell became Director of Home Care in early 2000 and was Plaintiff's supervisor for most of Plaintiff's tenure. Id. at ¶ 18. Plaintiff received a copy of the SRMC Handbook, including anti-discrimination and harassment policies. Id. at ¶ 19. Plaintiff was also given a copy of her job description at the beginning of her employment. Id. at ¶ 20. Plaintiff underwent an orientation period and received outside training as hospice manager. Id. at ¶¶ 23, 24 and 25. Plaintiff had to learn hospital processes, state and federal regulators' requirements for a Hospice. Id. at ¶ 36. SRMC provides multiple procedures for employees to report complaints of unlawful discrimination or harassment and copies of such policies are distributed to all SRMC employees. (Docket Entry No. 46, Plaintiff's Responses to the Defendants' Statement of Undisputed Facts at ¶ 1. at ¶ 3).

According to the Plaintiff, in its 47-year history, SRMC virtually has not had any African Americans in management positions. A few African Americans have held management positions in Dietary (food service and cafeteria) and Environmental Services (housekeeping and sanitation). Id. at ¶ 2. Vance Deposition at pp. 8–10; Overstreet Deposition at pp. 11-14. Plaintiff notes that in Vance's eighteen (18) year tenure, SRMC has lacked any formal program to encourage minority applicants. Id.; Vance Dep. at pp. 13–14. Further, Overstreet conceded that SRMC is not concerned about the number of African Americans in management positions. Id.; Overstreet Dep. at pp. 17-18.

3

In April 2000, Ms. Farrell gave Plaintiff her first performance evaluation, which was favorable, and rated Plaintiff as meeting expectations, exceeding expectations, or developing, in all categories. Id. at ¶ 27. Farrell also noted that Plaintiff needed to "assess her current knowledge base regarding Hospice policies/procedures, state and federal regulations and JCAHO standards." Id. at ¶ 28. In November 2000, for her second performance evaluation, Farrell rated Plaintiff with "exceeds standards" in the liaison with medical staff and community leaders; assuming responsibility for ongoing self-development; and accessing appropriate people to validate competency and completed competency based assessment in self-appraisal. Id. at ¶ 29; Campbell Deposition, Exhibit 12. Plaintiff met expectations in all other categories, but had below expectations ratings in effective management of functions and customer service/interpersonal relations. Id. at ¶ 29. In November 2001, Farrell's rating of Plaintiff was meeting or exceeding expectations in all categories and noted that Plaintiff had made "great strides" and was "a pleasure to work with." Id. at ¶ 37. In November 2002, Plaintiff received another generally favorable evaluation from Farrell, as meeting or exceeding expectations in all categories. Id. at ¶ 40.

Yet, on the Addendum to the November 2002 evaluation, Farrell urged Plaintiff to familiarize herself with applicable processes and regulations, stating that "as Hospice Manager, Shirlene is accountable for understanding what information is necessary to maintain compliance with regulations and guiding staff to complete information within the required timeframe." Id. at ¶ 41. Paulette Fewell, Paula Farrell, and Nicole Brashear provided copies of the SRMC Standards of Performance in October 2002. Id. at ¶ 21. Plaintiff received copies of the Medicare Conditions of Participation, State Regulations, Admissions Criteria, and Standards of Practice applicable to Hospice in December 2002. Id. at ¶ 22.

4

Although Farrell made many favorable comments about Plaintiff in an addendum to the November 2002 evaluation, Farrell also noted that despite her "improvements" with Hospice team meetings, Plaintiff failed to submit a required report timely and hospice staff's complained about Plaintiff's rude and condescending treatment of them. Id. at ¶ ¶ 30-32. Plaintiff denied being rude or condescending and testified that she discussed this issue with the staff members and none reported that she had been discourteous with the exception of Janice Gregory and possibly Charlotte. Id. at ¶ 34. As Hospice Manager, Plaintiff was responsible for addressing disagreements and problems among her staff. Id. at ¶ 35. Plaintiff admits that Farrell also spoke with her about better prioritizing her tasks. Id. at ¶ 92.

The Joint Commission on Accreditation of Healthcare Organizations conducts a survey every three years. The State of Tennessee Department of Health, however, made a surprise survey after Farrell completed Plaintiff's 2002 performance evaluation. Id. at ¶ 43. The report found several deficiencies within hospice and directed SRMC to take corrective action or address these deficiencies. Id. at ¶ 44. The 2002 survey contained twice the number of deficiencies typically found on a survey, and SRMC's hospice rated a "3" on a scale of 1 to 10, with "1" being the worst possible survey result, and "10" the best. Id. at ¶ 45.

Farrell told Plaintiff that this survey needed to be taken seriously and that Plaintiff had to take ownership of the deficiencies in hospice section. Id. at ¶ 46. Plaintiff acknowledged that the deficiencies in the state survey fell within her area of responsibility. Id. at ¶ 47. About the same time, Farrell received complaints from hospice nurses about Plaintiff. Id. at ¶ 48; Farrell Deposition at pp. 67-69, 73-74. These nurses complained to Farrell about working long hours. Id. at ¶ 49. A nurse complained about Plaintiff during an Excellence Express forum and asked to be transferred

from Hospice to avoid Plaintiff. Id. at ¶¶ 55-56. Full-time nurses complained to Farrell about Plaintiff and her lack of clinical experience to provide the necessary clinical support for them. Id. at ¶ 57. Plaintiff cited her need for more staff, but Farrell deems inefficiencies, rather than understaffing, to be the problem. Id.; Farrell Deposition at 76-77. As manager, Plaintiff's duty was to identify and plan improvements to correct these problems. Id. at ¶ 50.

In December 2002, concern increased about turnover and morale issues among the hospice nurses and Farrell contacted Amy Overstreet, SRMC's human resources director. Id. at ¶ 60. Overstreet subsequently interviewed all three full-time hospice nurses. Id. at ¶ 61. Two of the three nurses complained about Plaintiff's condescension, her failure to listen to them, and her inability to provide clinical direction. Id. at ¶ 62. Plaintiff told Overstreet that the nurses were not perceiving her correctly. Id. at ¶ 64. Overstreet concluded that, as manager, Plaintiff was responsible for resolving these issues. Id. at ¶ 65. Plaintiff admits that in 2002 and 2003 a problem with staff morale in Hospice existed, and that it was appropriate for her supervisors to talk with her about these problems. Id. at ¶ 68.

On February 25, 2003, based upon the results of Overstreet's investigation of the morale issue among nurses, the survey, and Farrell's concern about Plaintiff's lack of familiarity with applicable processes and regulations, Plaintiff received a disciplinary action. Id. at ¶¶ 69-70. Plaintiff described her disciplinary action as a surprise, but prior to her termination, Plaintiff never told anyone at SRMC that the disciplinary action was racially motivated. Id. at ¶¶ 71-72. Plaintiff did comment to Brashear that if it were not for her faith, she could understand how people could react violently in such a situation. Id. at ¶ 73. Brashear became upset and concerned about Plaintiff's reaction to the disciplinary action and documented this conversation with Plaintiff. Id.

6

at ¶ 74.

After the February 25, 2003, an action plan was adopted to address the deficiencies in Plaintiff's performance as hospice manager. Id. at ¶ 75. Overstreet suggested that Plaintiff work with Kim Walker, assistant human resources manager on a job analysis of her position. Id. at ¶¶ 76-77. Plaintiff and Walker analyzed the time Plaintiff spent on various tasks and the need to prioritize her tasks. Id. at ¶ 78. Farrell also had follow up meetings with Plaintiff to discuss her progress on her action plan, but on one occasion, Plaintiff left her job analysis in her vehicle prior to their meeting. Id. at ¶¶ 79-80.

Plaintiff met with Farrell about problems in hospice section quite a few times in 2003, a "rough year." Id. at ¶ 82. In 2003, patient hospice's census was lower than the previous year, generating concern and discussion. Id. at ¶ 83. In March 2003, a physician complained to Farrell that a patient had been admitted to hospice without notice to the physician. Farrell reminded Plaintiff that she and Brashear needed to be "kept in the loop" on these kinds of situations. Id. at ¶ 84. Plaintiff believes this incident happened when she was not present. Id.; Campbell Dep. at pp. 223-24. Other doctors complained and/or made negative comments to Brashear and Farrell about hospice, and, specifically, Plaintiff. Id. at ¶ 85; Brashear Deposition at 46; 52; Farrell Deposition at 103-04. One physician told Brashear that Plaintiff did not know what she was doing and should be terminated. Id. at ¶ 86; Brashear Deposition at 53. Plaintiff admits that these two physicians had problems with hospice and stopped sending referrals to Hospice during this period. Id. at ¶ 87. In April 2003, Farrell advised Plaintiff that she had not submitted some of the information required by the action plan. Id. at ¶ 81.

In the late Spring or early Summer of 2003, SRMC received notice that Home Care

7

(including Home Health and Hospice) would be subjected to a JCAHO Survey in September 2003. Id. at 88. Preparation for a JCAHO Survey is very time-consuming and takes priority over other matters. Id. at ¶ 89. Farrell and Brashear asked Plaintiff to update the hospice policy manuals. Id. at ¶ 90. Farrell inquired several times about the status of Plaintiff's report prior to the JCAHO survey, but Plaintiff took longer than anticipated to complete the updates. Id. at ¶ 91. On July 23, 2003, Farrell sent Plaintiff an e-mail expressing her frustration with hospice, particularly on the efficient utilization of hospice staff, and told Plaintiff, as Hospice Manager, she needed to "step up to the plate," and prioritize her tasks. Id. at ¶ 92.

In August 2003, one of the Hospice nurses was in an automobile accident on the way home from work, and Plaintiff ordered the nurse to submit to a drug test, believing the nurse was "on duty" when the accident occurred. Id. at ¶ 93. Plaintiff insists she was told to do so by corporate health section. Campbell Dep. at 240. The nurse was angry with Plaintiff and complained to Farrell about the way Plaintiff treated her and resigned because of this incident. Id. at ¶ 95. This nurse's resignation left Hospice understaffed during a very busy period and prior to the JCAHO survey. Id. at ¶ 96.

During the summer of 2003, Brashear talked more than once to Farrell about Plaintiff's work as hospice manager. Id. at ¶ 98; Brashear Deposition at 69. Farrell tried to work with Plaintiff for several months to improve circumstances. Id. at ¶ 99; Farrell Deposition at 33; 104. Brashear believed Farrell was too tolerant of Plaintiff's weaknesses as hospice manager and was "fighting the termination." Id. at ¶¶ 100-01; Brashear Declaration ¶ 5; Overstreet Deposition at 70; 81-82. Farrell and Brashear met with Plaintiff on September 5, 2003, about Plaintiff's performance as hospice manager, and during this meeting, Brashear told Plaintiff she was unsure if Plaintiff had the

8

skill set to continue as hospice manager. Id. at ¶ 103; Brashear Deposition, Exhibit 8. Plaintiff, however, does not recall these statements being made. Id.

The JCAHO survey occurred from September 16-18, 2003 and a JCAHO surveyor interviewed Plaintiff and went on a patient visit with her. Id. at ¶¶ 104-05. Plaintiff felt that the JCAHO surveyor did not think highly of her, and she formed this opinion before learning that the JCAHO surveyor had made unfavorable comments about Plaintiff to Farrell and Brashear. Id. at ¶ 106. During the survey, the JCAHO surveyor asked to see Plaintiff's personnel file, and at the end of the survey, the JCAHO surveyor told Farrell and Brashear she had concerns about the leadership of hospice under Plaintiff. Id. at ¶ 114; Brashear Deposition at p. 76, Ex. 7; Farrell Deposition at p. 107. The JCAHO surveyor expressed a specific concern about Plaintiff's lack of understanding of applicable regulations and inability to guide Hospice staff on these issues. Id. at ¶ 115; Brashear Deposition at 82, Exhibit 7; Farrell Deposition at 107. Home Care received an overall score of 92 on the JCAHO survey, but the areas under Plaintiff's supervision received two Type I citations for deficiencies that needed to be corrected. Id. at ¶¶ 107-08. For contract management, hospice received a score of 5, the worst possible score, but Plaintiff denies this area as her responsibility. Id. at ¶ 109. In the area of patient assessment, Hospice received a score of 3, which meant corrective action was needed. Id. at ¶ 111. The areas under the supervision of Inez Stubblefield did not receive any Type I citations. Id. at ¶ 112. The JCAHO representative cited the lack of documentation of counseling in Plaintiff's personnel file, and Home Care probably would have received a lower score for not addressing leadership performance issues within the department. Id. at ¶ 116. Brashear Deposition at 76, Ex. 7; Farrell Deposition at 107. The JCAHO surveyor suggested that Brashear and Farrell look for new leadership of Hospice. Id. at ¶ 117; Brashear Deposition at 76, Exhibit 7.

9

It was very unusual for a JCAHO surveyor to make comments of this nature. Id. at ¶ 118.

Farrell recommended terminating Plaintiff after the JCAHO's surveyor's unfavorable remarks about Plaintiff on September 18, 2003. Id. at ¶ 119; Brashear Deposition at 70; 73. Farrell made the decision to terminate Plaintiff, and Brashear concurred in the decision based upon her opinion, observations and interactions with Plaintiff. Id. at ¶¶ 120-21. Overstreet agreed that Plaintiff had been treated fairly and that there were grounds for termination. Id. at ¶ 122. Farrell and Brashear met with Plaintiff and told her that her employment was terminated effective September 26, 2003. Id. at ¶ 123. During this meeting, Farrell and Brashear cited the disappointing results for both the JCAHO survey, the prior state survey, staff morale issues, and the turnover problem in Hospice, including the specific situation of the nurse who had recently resigned because of Plaintiff's handling of the drug test issue. Id. at ¶ 124. Plaintiff was never told that she was being terminated because of the 92 score on the JCAHO survey. Id. at ¶ 125. After her termination, Plaintiff wrote a letter to the JCAHO complaining about their surveyor's negative comments about her to her supervisors. Id. at ¶ 127.

Plaintiff notes that when she became hospice manager, she initially supervised a staff of two FTE ("full time equivalent") nurses, and a PRN ("part time, as needed") nurse. Id. at ¶ 128. Plaintiff's predecessor as hospice manager had not been a social worker, and therefore had to rely on registered nurses, social workers and social workers who were "borrowed" from the hospital to perform the social work functions for the hospice section. Id. at ¶ 130. Plaintiff was aware her social work functions for hospice were among her managerial duties when she was hired, but Plaintiff asserts she did not know that she was going to be short staffed when she was hired initially. Id. at ¶ 131.

10

Plaintiff also assumed additional duties of the social work, for Home Health. As a result, Plaintiff worked 50-60 hours per week. Id.; Campbell Deposition pp. at 67-68. Plaintiff asserts that throughout her employment, the Hospice section remained understaffed. Id.; Campbell Deposition at p. 42, 45. Plaintiff, however, was able to borrow a social worker for the first three months of her employment. Id. at ¶ 132; Campbell Deposition at 47. Plaintiff admits that assigning all the social work duties to her was because she had a social work degree, whereas her predecessor did not have that degree. Id. at ¶ 133. At various points throughout Plaintiff's employment with SRMC, social workers were made available to assist Hospice. Id. at ¶ 141; Campbell Deposition at 51-52. SRMC never recruited a PRN social worker for Hospice prior to Plaintiff's termination, and Plaintiff interviewed some candidates. Id. at ¶ 142; Campbell Deposition at 192-93. Plaintiff admits a plan in place to recruit a back up social worker for Hospice, but noted that Defendants set special qualifications for the social worker's position making it difficult to fill. Id.; Campbell Deposition at p. 192-93.

Any permanent increases in the hospice's staffing level required approval of SRMC's higher management and its board of directors. Id. at ¶ 135. Plaintiff would have had to undertake the research and preparation of a written proposal to support an increase in the hospice's budget for additional employees. When Plaintiff complained Hospice was understaffed, Brashear advised her to submit a written proposal. Id. at ¶ 137. On December 30, 2002, Plaintiff and Brashear discussed the staffing situation for Hospice. Id. at ¶ 139. Plaintiff, however, never submitted a written proposal with benchmarks for clerical or a social worker position, but she had previously submitted two proposals for additional clerical and/or social work staffing benchmarks. Id. Plaintiff had performed an analysis and submitted a proposal for an additional full time nurse in writing. The

11

proposal was to hire a third nurse and was approved. Id.; Campbell Deposition at p. 122-23.

At the end of 2002, Ms. Brashear asked Campbell to present a proposal with supporting documentation for additional social work and increase in part-time clerical staffing. Campbell Dep. at p. 197-98. In June of 2003, Brashear sent a note to Plaintiff about her failure to submit the documentation for staffing in time to include in the budget for the upcoming fiscal year, and expressing her disappointment about Plaintiff's failure to do so, but Plaintiff does not recall receiving the note. Id. at ¶ 140; Brashear Dec. ¶ 3, Ex. 2; Campbell Deposition at p. 204-06.

Overall staffing of hospice increased during Plaintiff's employment. Id. at ¶ 144. In 2002, Hospice added a full time nurse, as Plaintiff requested. Id. at ¶ 145. In October 2002, Plaintiff was given a part-time clerical assistant to assist with administrative functions for Hospice. Id. at ¶ 146. In July 2002, Farrell urged Plaintiff to complete her proposal for additional clerical staff ASAP so the additional hours could be part of the budget for the following year. Id. at ¶ 147. A bereavement coordinator was also hired during Plaintiff's employment. Id. at ¶ 148. Workers from other areas of the hospital were assigned to Hospice. Id. at ¶ 149.

Plaintiff contends she was understaffed because she is African American compared to Home Health as well as other areas of the hospital. Id. at ¶ 151; Campbell Deposition at 55-56. Plaintiff notes that David Vance (Chief Operating Officer) testified that other departments during this tenure did not have staff shortages nor did any manager complain of inadequate staffing. Id. Vance Deposition at p. 37. Plaintiff, however, lacks specific knowledge about how other departments, including Home Health, were staffed. Id. at ¶ 152. Plaintiff testified that she did not know or was unsure if Brashear, Vance and Sugg had a racially discriminatory motive. Id. at 153; Campbell Deposition at pp. 58-59. Based upon its higher patient census, home health services has historically

12

been budgeted and staffed at a higher level than Hospice. Id. at ¶ 154.

Other than internships during school, Plaintiff had no prior experience with hospice work nor in the health care industry at the time she applied to work at SRMC. Id. at ¶ 155. Other than working as a supervisory bank teller, Plaintiff had no prior experience as a supervisor, and had no prior management experience. Id. at ¶ 156. Plaintiff's starting salary as hospice manager was higher than her predecessor in the position, who was white, but she did not have a degree in social work. Id. at ¶ 157; Campbell Deposition at p. 64. Plaintiff's starting salary was $36,000, and when she left Hospice her annual salary was more than $40,000. Id. at 158. Inez Stubblefield, a registered nurse, had supervisory experience in a clinical setting prior to being hired by SRMC. Id. at ¶ 159. Stubblefield's starting salary was higher than Plaintiff's for those reasons. Id. at ¶ 160. Plaintiff does not compare her qualifications with Stubblefield's. Plaintiff's successor as Hospice Manager, Gaylia Jones, was also an RN with many years of prior supervisory experience, including 7 years as Director of Clinical Services at a hospice. Id. at ¶ 163. Jones received a higher starting salary because she is an RN and had more clinical and supervisory experience. Id. at ¶ 164.

A consulting firm's market analysis was used to set starting salaries for SRMC employees, including Plaintiff. Id. at ¶ 166. After Plaintiff's termination, Ms. Brashear and Ms. Farrell made a decision to recruit and if possible hire an RN for the Hospice Manager position. Id. at ¶ 167. This was due to the frequent complaints from Hospice nurses that they could not receive adequate clinical guidance from a social worker. For example, a hospice nurse stated at an Excellence Express forum in February 2003 that "its frustrating to be supervised by a person who is clueless as to the role of a nurse." Id. at ¶ 168.

Plaintiff admits that no one ever "told" her that she could not take vacation days, however,

13

she was unable to take a full week of vacation because she was the only full-time social worker and could not find a replacement. Id. at ¶ 169; Plaintiff's Deposition at pp. 78-80. Plaintiff actually asked for a week of vacation, and was denied, only once, or maybe twice, towards the beginning of her employment in 2000. Id. at ¶ 170. Plaintiff understood that she could arrange for social workers to provide back-up coverage for her to take a week off, but she cites the lack of available back-up coverage to her. Id. at ¶ 171. Plaintiff does not know how many hours per week either Inez Stubblefield or Paula Farrell worked, although she stated that she (Plaintiff) and Stubblefield were the "ones that were last to leave the building." Id. at ¶ 174. Plaintiff was never subjected to any overt racial remarks or slurs by Farrell. Id. at ¶ 176. Brashear never heard Farrell speak about Campbell in racial terms, or use any direct or implied derogatory racial names or slurs in reference to Campbell. Id. at ¶ 177. Plaintiff, however, felt Farrell set her up to fail from the outset of her employment, for racially discriminatory reasons. Id. at ¶ 178. Nevertheless, Plaintiff admits that at times Farrell gave her positive reviews and feedback. Id. at ¶ 179. Plaintiff believes that only the negative reviews and feedback from Farrell were unfair and racially motivated. Id. at ¶ 180.

Plaintiff admitted that if hospice failed, this failure would reflect poorly on Farrell. Id. at ¶ 181. Plaintiff agreed that it was appropriate for Farrell to treat her differently than other hospice employees because as manager, Plaintiff was ultimately accountable for any problems or issues with Hospice, but not as an African-American. Id. at ¶ 182. Plaintiff admitted she does not know whether Stubblefield was criticized by Farrell or subject to the same level of scrutiny she was. Id. at ¶ 183. Plaintiff admitted that white employees also complained about Farrell being unfair, and that she was not the only one who found Farrell hard to work with. Id. at ¶ 184. Farrell also counseled Plaintiff's successor as hospice manager, who was white, regarding performance issues.

14

Id. at ¶ 185. Plaintiff admitted she could not say that Ms. Brashear had any racially discriminatory motive towards her, but cites Brashear's support of Farrell, whom Plaintiff believes had a racial animus. Id. at ¶ 187.

Plaintiff asserts an inference about Overstreet's use of the terms "ownership" and "renting versus owning." These phrases are frequently used at SRMC to refer to the concept of staff accepting accountability for their areas of responsibility, and is part of a management training program called "Excellence Express." Id. at ¶ 188; Overstreet Deposition ¶ 2, Exhibits 2-4; Campbell Deposition at 101-102; Overstreet Deposition at 64. Plaintiff asserts that Overstreet's statement to her that she was a "renter" and not an "owner" was not made in that context because the concept of taking ownership was discussed in group meetings, not privately. Id. at ¶ 188; Campbell Deposition at pp. 101-104. Overstreet testified that when she referenced "ownership" and being a "renter" instead of an "owner" to Campbell during their meeting following the disciplinary action presented to Campbell in early 2003, she was referencing the issue of accountability. Plaintiff never complained to anyone above her in management or in the Human Resources Department at SRMC that she felt she was being harassed and/or discriminated against based on her race, prior to being told she had been terminated. Id. at ¶ 193.

## B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp.

v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required

16

showing of the respective parties as described by the Court in <u>Celotex</u>

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991)(quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 353 (6th Cir. 1989) (quoting <u>Celotex</u> and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting <u>Liberty Lobby</u>). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

17

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731

(6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must

determine `whether the evidence presents a sufficient disagreement to require a submission to the

jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty

Lobby)).

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

> * * *

> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the

movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company, 791 F.2d. 43, 46 (6th Cir. 1986)  app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Here, the parties have given some references to the proof upon which they rely. Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and

19

other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

    1.     Complex cases are not necessarily inappropriate for summary judgment.

    2.     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

    3.     The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

    4.     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

    5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

    6.     As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

    7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

    8.     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

    9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

    10.    The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

20

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Title VII of the Civil Rights Act of 1964, states, in relevant part, that it shall be an unlawful employment practice for an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ....

42 U.S.C. § 2000e-2(a)(1).

In the absence of direct evidence of discrimination, Title VII claims are subject to a three-part, burden-shifting analysis: (1) the plaintiff must establish a prima facie case of discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was pretextual. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Accord Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The burden of persuasion remains with the plaintiff at all times. Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir. 1990).

For disparate treatment Title VII claim, the plaintiff's prima facie showing of disparate treatment requires proof that:

21

1. Plaintiff is member of a protected class;
2. Plaintiff suffered an adverse employment action;
3. Plaintiff was qualified for the position;
4. Plaintiff was treated differently than similarly-situated employees outside of the protected class for the same or similar conduct.

Abeita v. Transamerica Mailings, Inc., 159 F.3d 246, 252 (6th Cir. 1998). See also McDonnell Douglas Corp., 411 U.S. at 802. For discriminatory discharge claims, the McDonnell Douglas paradigm is slightly modified. See Morvay v. Maghielse Tool and Die Co., 708 F.2d 229, 233 (6th Cir. 1983); Potter v. Goodwill Indus., 518 F.2d 864 (6th Cir. 1975). To make a prima facie case of discriminatory discharge, the plaintiff must show that her discharge was "without valid cause, and that the employer continued to solicit applications for the vacant position." Id. at 865.

Here, Plaintiff is a member of the protected class and she suffered an adverse job action with her termination. While Plaintiff was qualified for the position at the time she was hired, Plaintiff has not presented proof that the Defendants' stated reasons for her termination were invalid. The State and JCAHO surveys that found deficiencies in Plaintiff's assigned work and those deficiencies are valid causes for discharge. Plaintiff has not shown those survey findings to be invalid.

As to any disparate treatment claim, under Title VII standards, Plaintiff must show that the comparable employees are "similarly situated in all respects." Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir. 1999) (quoting Mitchell, 964 F.2d at 583). "'Precise equivalence in culpability between employees' is not required. Rather, Plaintiff must simply show that the employees were engaged in misconduct of 'comparable seriousness.'" Id. (quoting Harrison, 80 F.3d at 1115 & McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n. 11 (1976)). Thus, the similarly-situated employees with whom Plaintiff seeks to compare her treatment must have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct

22

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583. The Sixth Circuit warned in Ercegovich v. Goodyear Tire and Rubber Co. that Mitchell should not be read so narrowly as to require a plaintiff to be identically situated to the non-protected employee in every single aspect of their employment. Ercegovich, 154 F.3d 344, 353 (6th Cir. 1998). For with such a narrow reading, "a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a prima facie case...." Id. The employee and his or her similarly situated counterparts only need be similar in "all of the relevant aspects." Id. at 352. Plaintiff's proof lacks any comparable employer who is white, and was better treated that Plaintiff.

Assuming Plaintiff's cited inferences to the paucity of other black managers in other departments, the Defendant's vice-president's lack of knowledge about Plaintiff's termination and the supervisor's remarks about Plaintiff being a renter are probative, "the burden... shift[s] to the defendant articulate some legitimate, nondiscriminatory reasons for the plaintiff's rejection." McDonnell Douglas, 411 U.S. at 802. "The defendant must clearly set forth, through introduction of admissible evidence, reasons for its actions...." Burdine, 450 U.S. at 255. The defendant "need not persuade the [trier of fact] that it was actually motivated by the proffered reasons," 450 U.S. at 254, but "only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus." Id. at 257. The defendant's burden is, thus, one of production; not persuasion. Id. at 254-55. Although the burden of production shifts to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [her] remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

23

Once the defendant meets this burden, the plaintiff must show that the employer's proffered reason is pretextual. Id. "It is not enough to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination." Id. at 519. But "[a] plaintiff does not need to introduce additional evidence of discrimination to prevail on the merits." Kline v. Tennessee Valley Auth., 128 F.3d 337, 347 (6th Cir. 1997). Discrimination can be found once a prima facie case is established along with the disbelief of the proffered reasons for the adverse employment action. Id. To challenge the employer's explanation for an adverse employment action, the plaintiff must show, by a preponderance of the evidence, "either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 883 (6th Cir. 1993).

Analyzed as a disparate treatment, the Court concludes that Plaintiff has failed to establish a prima facie case of racial discrimination. There is no dispute in the record that Plaintiff is a member of a protected class, who suffered an adverse employment action, and who was qualified for the position she had. Yet, Plaintiff failed to show that the employees with whom she compared herself were similarly-situated and treated more favorably. Moreover, given the substantial evidence on Plaintiff's job performance, there is not any proof that the stated reasons to terminate Plaintiff's employment were a pretext for racial discrimination. Given the undisputed and substantial proof about Plaintiff's job performance, Plaintiff's inferences of racial discrimination are not reasonable because under the undisputed facts here, those inferences are not probative of racial bias and would not support a judgment on her claims.

For these reasons, the Defendants' motion for summary judgment (Docket Entry No. 35) should be granted.

24

An appropriate Order is filed herewith.

**ENTERED** this the _____ Day of September, 2007.

WILLIAM J. HAYNES, JR.
United States District Judge